**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

RHONDA S. PHILLIPS,                          :

                                    Case No. 3:10-cv-378

              Plaintiff,

                                    District Judge Walter Herbert Rice
                                    Magistrate Judge Michael R. Merz

   -vs-

MICHAEL J. ASTRUE,
Commissioner of
1Social Security,

             Defendant.                    :

---

**REPORT AND RECOMMENDATIONS**

---

        Plaintiff brought this action pursuant to 42 U.S.C. §405(g) for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

        Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury.

*Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988);  *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole.  *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365  (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984).  However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.  *Garner, supra.*  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion.  *Elkins v. Secretary of Health and Human Services*, 658 F.2d  437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423.  To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy.  42 U.S.C. §423(d)(2).

The Commissioner has established a sequential evaluation process for disability determinations.  20 C.F.R. §404.1520.  First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled.  Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment

or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1. If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSD on September 12, 2003, alleging disability since August 13, 2002, due to back surgeries and ulnar nerve surgeries. (Tr. 64-66; 82-91). The Commissioner denied Plaintiff's application initially and on reconsideration. (Tr. 44-45). Administrative Law Judge Melvin Padilla held a hearing, (Tr. 845-75), following which he determined that Plaintiff was not disabled. (Tr. 382-97).

Plaintiff filed another application for SSD and an application for SSI in December, 2006, alleging disability since August, 2002, due to back and arm impairments and depression. (Tr. 415-22, 463, 830-33).

During this time, the Appeals Council granted Plaintiff's request for review of Judge Padilla's decision and remanded the matter for further proceedings. (Tr. 398). On remand, Judge Padilla escalated Plaintiff's December, 2006, applications, held a hearing on all of Plaintiff's applications, (Tr. 876-905), and found that Plaintiff is not disabled. (Tr. 16-32). The Appeals

Council denied Plaintiff's request for review, (Tr. 8-11), and Judge Padilla's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Padilla found that she has severe vertebrogenic disorder of the lumbar spine with residuals of surgery, history of right epicondylitis (elbow area) and related surgery, and, since December, 2006, depression, but that she does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 22, ¶ 3; Tr. 23, ¶ 4). Judge Padilla also found that Plaintiff has the residual functional capacity to perform a limited range of light work. *Id.,* ¶ 5. Judge Padilla then used sections 202.20 through 202.22 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony and determined that Plaintiff is not disabled, (Tr. 30. ¶ 10), and therefore not entitled to benefits under the Act. (Tr. 31, ¶ 11).

Plaintiff has a history of undergoing surgery for a herniated nucleus pulposus that Dr. Polestra performed in 1995. See Tr. 120-26; 209.

In September, 2000, Plaintiff underwent an ulnar nerve release of the right elbow that Dr. Klug performed. See Tr. 127-40. Plaintiff underwent an exploration of the ulnar nerve with neurolysis releasing the nerve sheath by a longitudinal cut which Dr. Klug performed in February, 2002. See Tr. 141-53. Although Plaintiff experienced improvement initially, by October, 2002, she complained her pre-operative upper extremity symptoms had returned. See Tr. 160-62, 169-70.

Plaintiff consulted with physical medicine and rehabilitation specialist Dr. Beegan on October 21, 2002, who reported that Plaintiff complained of persistent numbness of her right fourth and fifth fingers, progressive elbow swelling, intermittent right hand cramping, right hand swelling, increased sweating, nail bed color change, and decreased coordination. (Tr. 160-62). Dr.

Beegan also reported that Plaintiff's right arm exhibited redness around the surgical scar, mild swelling, right hand increased moisture with a slightly dusky color, diminished sensation at the fourth and fifth fingers along the medial hand and forearm, and profound loss of sensation over the medial elbow. *Id.* Dr. Beegan identified Plaintiff's diagnoses as probable complex regional pain syndrome/reflex sympathetic dystrophy of the right arm and focal dystonia of the right fingers. *Id.*

Plaintiff consulted with hand surgeon Dr. Klug on May 19, 2003, who reported that Plaintiff's right upper extremity impairment presented non-surgical problems. (Tr. 167).

Plaintiff received treatment from pain management specialist Dr. Lichota of the Pain Evaluation & Management Center of Ohio during the period. April, 2003, through August, 2005. (Tr. 250-70; 499-514; 704-36). When Dr. Lichota first evaluated Plaintiff, she reported that Plaintiff had abnormal upper extremity reflexes, right hand strength, and right hand swelling. *Id.* Over time, Dr. Lichota reported that Plaintiff continued to complain of muscle spasms, swelling, achiness, muscle weakness, loss of sensation as well as right elbow and forearm pain and cramping. *Id.* Dr. Lichota performed several stellate ganglion blocks which provided Plaintiff with some relief for a short period of time. *Id.*

Plaintiff consulted with pain specialist Dr. Bruce in February, 2003, for complaints of low back and leg pain. (Tr. 181-82). At that time, Dr. Bruce reported that Plaintiff stood with ease and walked without any apparent limp or protective behavior, her lumbosacral spine motion was surprisingly good in all planes, although she had some aggravation of the radicular-type pain with flexion and rotation to the right and especially to the left, and that she walked on her heels and toes without difficulty. *Id.* Dr. Bruce also reported that Plaintiff's reflexes seemed somewhat hyperactive on the left side, manual motor testing of the lower extremities showed a subjective

5

weakness on the left side, the paraspinous muscles in the lumbar area were very tight, and that she had numbness and tingling along the left lateral lower leg. *Id.* Dr. Bruce noted that Plaintiff appeared to have suffered at least a partial recurrent herniated disc, a significant strain-sprain injury of the lower back, and that she had widespread muscle spasm in the paraspinous muscles with pain in the buttocks as well as radicular pain down her left leg. *Id.* Dr. Bruce reported on March 6, 2003, that Plaintiff's recent MRI suggested a significant amount of spinal stenosis as well as significant degenerative changes involving bilateral facet arthritis and the development of a cyst on one of the facet joints. (Tr. 180).

Plaintiff returned to Dr. Polestra on March 10, 2003, at which time she complained of left thigh pain that radiated down her leg through her foot, numbness, tingling, and muscle spasm. (Tr. 199). On April 15, 2003, Dr. Polestra performed a left L4-5 laminotomy/foraminotomy with cyst removal. (Tr. 163-66). Subsequently, Plaintiff complained of back pain, weakness, and muscle spasms and she participated in physical therapy. (Tr. 195-96).

Treating physician Dr. Keys reported on November 10, 2003, that he first saw Plaintiff sometime in the 1970s, her diagnoses were low back pain, status post removal of a lumbar cyst, chronic neuropathy and RSD of the right upper extremity, lumbar laminectomy several years ago, and insomnia. (Tr. 175-79). Dr. Keys also reported that Plaintiff had undergone two back surgeries and two surgeries on the ulnar nerve, she had chronic pain of the right upper extremity and had been diagnosed with RSD, that she had been off work since August, 2002, and that her right hand had full range of motion and was a little duskier than the left hand. *Id.* Dr. Keys noted that Plaintiff might need a fusion of her lumbar spine and that she was able to sit for one hour, developed low back pain when she stood for more than fifteen minutes, was able to walk a mile, that her

6

concentration was okay, and that her thinking was clear. *Id.* Dr. Keys opined that Plaintiff would never be able to return to factory work which she had formerly performed. *Id.*

A January 27, 2004, MRI of Plaintiff's lumbar spine revealed the L4-5 laminectomy, foraminal stenosis with "exuberant" facet disease and possible left L4 nerve root impingement. Tr. 313. A March 9, 2004, EMG was suggestive of an old or chronic left L5 radiculopathy. (Tr. 186). An MRI of Plaintiff's lumbar spine performed in July, 2004, revealed possible L5 nerve root contact and facet arthropathy L3 through S1. (Tr. 308). During this period of time, Dr. Polestra noted that Plaintiff complained of extreme left leg pain and difficulty walking, left leg weakness, low back pain, right-side symptoms, pain radiating into both hips down to the calf on the right and toes on the left, numbness, tingling, limited range of back motion, and decreased sensation. See Tr. 301-08. On July 8, 2005, Dr. Polestra reported that Plaintiff had significant pain to palpation of the right sacroiliac joint and hip and decreased sensation along the S1 dermatome on the left. *Id.*

Dr. Bruce reported on August 5, 2005, that Plaintiff walked favoring her right leg and had tenderness along her lumbosacral spine and right sacroiliac joint. (Tr. 332-33). On November 11, 2005, Dr. Bruce noted that Plaintiff had diminished sensation along the L5-S1 distribution on the left as well as mildly reduced quadriceps strength on the left. *Id.* A November 11, 2005, EMG was mildly abnormal. (Tr. 316).

Dr. Keys reported on January 16, 2006, that Plaintiff was able to lift/carry up to five pounds, stand/walk for six hours in an eight-hour day and for one hour without interruption, sit for three hours in an eight-hour day and for thirty minutes without interruption, and that she should not work for more than four hours a day. (Tr. 380-81). On September 12, 2007, Dr. Keys reported that Plaintiff was severely impaired in her ability to perform many work-related mental activities. (Tr.

739-41).

Examining physician Dr. Long reported on January 25, 2006, that Plaintiff had normal muscle strength, normal ability to grasp, no muscle spasm, spasticity, clonus, or primitive reflexes, and that there was not muscle atrophy. (Tr. 318-27). Dr. Long also reported that Plaintiff's ranges of motion were all normal both actively and passively, she had some diminished lumbar range of motion, and that she displayed a slow, shuffling gait. *Id.* Dr. Long noted that Plaintiff's sensory exam was normal, she had positive Waddell sign and Spurling's maneuver on the right, and that her reflexes were quite brisk. *Id.* Dr. Long identified Plaintiff's diagnoses as evidence of chronic mechanical low back pain, history of herniated nucleus pulposus L4-L5, and clinical evidence of cervical radiculopathy. *Id.* Dr. Long opined that Plaintiff was able to occasionally lift/carry up to twenty-five pounds, stand/walk for six hours in an eight-hour day and for two hours without interruption, and sit for six hours in an eight-hour day and for four hours without interruption. *Id.*

Over time, Plaintiff continued to complain of the back, leg, and hip symptoms. In January, 2008, Dr. Polestra performed a decompression laminectomy at L3, L4, L5, and S1 with hardware placement and fusion of L2-3, L3-4, L4-5, and upper S1. (Tr. 772-89).

In addition to her alleged exertional impairments, Plaintiff alleges that she is disabled by a mental impairment. Dr. Keys has treated Plaintiff with medications for anxiety, insomnia, and depression since at least August, 2002. See, *i.e.,* Tr. 348, 363, 376, 680, 766. In addition, Dr. Lichota noted that Plaintiff had anxiety and depression. See, *i.e.,* Tr. 265, 500.

Examining psychologist Dr. Jones reported in November, 2003, that Plaintiff graduated from high school, saw a psychiatrist in 1984, for anxiety and depression, was cooperative,

had normal speech and thought processes, and that her presenting demeanor was resigned. (Tr. 271-75). Dr. Jones also reported that Plaintiff had an appropriate affect, sat with a closed posture and maintained limited eye contact, was preoccupied with her symptomatology, evidenced a degree of confusion, proved alert to distracted with regard to her degree of consciousness, was oriented, and presented with marginal to sufficient information, judgment, and common sense. *Id.* Dr. Jones noted that Plaintiff's diagnoses were pain disorder with psychological and medical features and dysthymic disorder and she assigned Plaintiff a GAF of 53. *Id.* Dr. Jones opined that Plaintiff abilities to related to others, to understand, remember, and follow instructions, and to withstand the stress and pressures associated with day-to-day work activity were moderately impaired and her ability to maintain attention and concentration to perform simple repetitive tasks was mildly impaired. *Id.*

Plaintiff sought mental health treatment at Eastway in December, 2006, at which time the evaluating mental health specialist noted that Plaintiff's affect was constricted and her mood "severely depressed", her diagnosis was major depressive disorder, and her GAF was 43. (Tr. 638-49A). In March, 2007, a therapist noted that Plaintiff was overwhelmed with a depressed mood. (Tr. 630).

Examining psychologist Dr. Flexman reported on February 27, 2007, that Plaintiff was a high school graduate, moderately obese, attended counseling at Eastway once a week, displayed a relaxed posture, had an evident gait disturbance, and that her facial expressions and general body movements were within normal limits. (Tr. 537-40). Dr. Flexman also reported that Plaintiff's speech was appropriate, her eye contact was fair sixty-percent of the time, she demonstrated overt pain behavior when sitting, standing, walking, and moving, her affect was

9

intense and lability was noted, and that her attitude was depressed. *Id.* Dr. Flexman noted that Plaintiff was oriented, her attention and concentration were fair, her recent and remote memories were good, her judgment was fair, and obsessive thinking concerning somatic or other psychological problems was out of proportion with reality and somatization was present. *Id.* Dr. Flexman also noted that Plaintiff reported recent suicidal ideations. *Id.* Dr. Flexman identified Plaintiff's diagnoses as pain disorder associated with both general medical condition and psychological factors and major depression, recurrent and moderate and he assigned her a GAF of 50. *Id.* Dr. Flexman opined that Plaintiff's abilities to understand, remember, and carry out short and simple instructions, to sustain concentration, and to interact with others were moderately impaired, her ability to make judgments for simple work-related decisions was slightly impaired, and her ability to respond appropriately to changes in the normal work setting was markedly impaired. *Id.*

In her Statement of Errors, Plaintiff alleges that the Commissioner erred by rejecting her treating physician's opinion and by failing to find that Plaintiff had a severe mental impairment prior to December, 2006. (Doc. 10).

In support of her first Error, Plaintiff argues that the Commissioner erred by rejecting treating physician Dr. Keys' opinion that Plaintiff is not able to work on a sustained basis. This Court agrees.

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards." *Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009). "One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because

10

>these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone of from reports of individual examinations, such as consultative examinations or brief hospitalizations."

*Id.*, *quoting*, *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544, (6th Cir. 2004), *quoting,* 20 C.F.R. § 404.1527(d)(2).

"The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley,* 581 F.3d at 406, *quoting, Wilson,* 378 F.3d at 544. "On the other hand, a Social Security Ruling[1] explains that '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 582 F.3d at 406, *citing, Wilson,* 378 F.3d at 544, *citing* 20 C.F.R. § 404.1527(d)(2).

"Closely associated with the treating physician rule, the regulations require the ALJ

---

FN 1. Although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

11

to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Blakley,* 581 F.3d at 406, *citing,* 20 C.F.R. §404.1527(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley,* 581 F.3d at 406-07,*citing,* Soc.Sec.Rule 96-2p, 1996 WL 374188 at *5. "The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."

*Blakley,* 581 F.3d at 407*, citing, Wilson,* 378 F.3d at 544. "Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley, supra, quoting, Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6th Cir. 2007)(emphasis in original).

In rejecting Dr. Keys' opinion, Judge Padilla essentially determined that it was not supported by objective findings. (Tr. 26). Judge Padilla declined to give Dr. Keys' opinion either

controlling or great weight and instead relied on examining physician Dr. Long's opinion.

As noted above, Dr. Keys has been Plaintiff's long-term treating physician; indeed, he has treated her since at least the 1970s. The record makes it clear that Dr. Keys has been responsible for coordinating Plaintiff's care with the other specialists of record and that he is aware of Plaintiff's diagnoses and treatments provided by her other health care providers. Based on his long-term treatment relationship with Plaintiff, Dr. Keys essentially opined that Plaintiff was disabled. This Court concludes that the evidence of record supports Dr. Keys' opinion.

First, Plaintiff's complaints with respect to her right hand have been consistent over time. Specifically, Plaintiff has complained of numbness of her right fourth and fifth finders, intermittent hand cramping and swelling, decreased coordination, and skin color changes. Consulting physician Dr. Beegan identified Plaintiff's diagnosis as, *inter alia,* reflex sympathetic dystrophy of the right arm. Dr. Lichota noted that Plaintiff had abnormal right upper extremity reflexes, right hand strength, and swelling.

With respect to Plaintiff's back and lower extremity impairments, the record reveals that Dr. Bruce reported Plaintiff had abnormal reflexes, tight paraspinal muscles in the lumbar spine, numbness in her left lateral lower leg, widespread muscle spasm, diminished sensation, reduced muscle strength, and tenderness. Dr. Polestra reported that Plaintiff had left leg weakness, significant pain to palpation of the right sacroiliac joint and hip, and decreased sensation.

The objective test results of record also support Dr. Keys' opinion. For example, an MRI of Plaintiff's lumbar spine revealed foraminal stenosis with "exuberant" facet disease and possible L4 nerve root impingement. Additionally, the EMGs of record revealed abnormal results.

Under these facts, the Commissioner erred by rejecting long-term treating physician

13

Dr. Keys' opinion that Plaintiff is disabled. Therefore, the Commissioner's decision is not supported by substantial evidence on the record as a whole.

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to remand the matter for rehearing or to reverse and order benefits granted. The Court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. §405(g). If a court determines that substantial evidence does not support the Commissioner's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 176 (6th Cir. 1994) (citations omitted); *see also, Newkirk v. Shalala,* 25 F.3d 316 (6th Cir. 1994).

This Court concludes that all of the factual issues have been resolved and that the record establishes Plaintiff's entitlement to benefits. Specifically, as noted above, Dr. Keys has been Plaintiff long-term physician who has reported that Plaintiff is disabled, and the objective clinical findings, and the objective test results support Dr. Keys' opinion. The only evidence which arguably conflicts with Dr. Keys' opinion are the findings of one-time examining physician Dr. Long and the reviewing physicians of record.

It is accordingly recommended that the Commissioner's decision that Plaintiff is not disabled and therefore not entitled to benefits under the Act be reversed. It is further recommended

14

that this matter be remanded to the Commissioner for the payment of benefits consistent with the Act.

August 2, 2011.

s/ <b>Michael R. Merz</b><br>United States Magistrate Judge

J:\Social Security - Drafts\Phillips_SSD.wpd

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).